**AMERISOURCEBERGEN CORPORATION and Neil Herson, Appellee**

**v.**

**John DOES 1 and 2, Appellants.**

Superior Court of Pennsylvania.

Submitted March 11, 2013.

Filed Nov. 8, 2013.

Reargument Denied Jan. 14, 2014.

Christopher G. Hayes, West Chester and William J. Conyngham, Washington, DC, for appellants.

Eric Kraeutler, Philadelphia, for appellees.

BEFORE: STEVENS, P.J.,* WECHT, J., and COLVILLE, J.**

OPINION BY WECHT, J.:

■ John Does 1 and 2 ("Appellants") challenge two July 11, 2012 trial court orders concerning pre-complaint discovery initiated by AmerisourceBergen Corporation ("ABC") and Neil Herson (collectively "Appellees"). In the first order, the trial court denied Appellants' "Emergency Petition for Disqualification of Counsel [for Appellees] and to Prohibit and Enjoin [Appellees] from Commencing an Action Against [Appellants] in Pennsylvania." In the second, the trial court granted Appellees' "Petition to Compel Disclosure of [Appellants'] Identity." We conclude that the orders as to which review is sought are neither final orders nor collateral orders, and therefore are not within our jurisdiction at this time. Consequently, we quash Appellants' appeal and remand.[1]

---

* President Judge Stevens did not participate in the consideration or decision of this case.

** Retired Senior Judge assigned to the Superior Court.

1. On April 5, 2013, Appellants filed an Application for Relief to Correct Case Docket in this case. Specifically, Appellants ask that this Court "correct" a notation in the docket that their brief was filed "late" on January 24, 2013. Pursuant to Pa.R.A.P. 2185(a)(1) and this Court's order dated December 14, 2012, Appellants were directed to file their brief on

The trial court has provided the following account of the factual and procedural history of this case:

On July 22, 2011, an article was posted on *www.barrons.com* titled "Profiting Off Medco–Express Merger is Easy as ABC: Lazard, by Avi Salzman." (Petition to Compel Disclosure of John Doe's Identity by Third Party Verizon Online, LLC, at ¶ 12[.]) At 2:37 p.m. on July 22, 2011, the following comment was posted online to this article by someone allegedly falsely identifying himself or herself as "Neil Herson[.]"

Neil Herson wrote:

Hassel's margin and EPS analysis is spot on. However, the other issue is working capital. Medco is a very fast payer—so fast that ABC operates in a very POSITIVE working capital position on its business. If Medco leaves, expect a $300–500 million cash hit to ABC.

(Petition to Compel Disclosure, ¶ 13[.])
A second comment was posted by someone later that day at 6:24 p.m., again allegedly falsely identifying himself or herself as "Neil Herson[.]"

Neil Herson wrote:

ABC sells a little over $300 million per business day. Cash on hand is 5 to 7 days of revenue. Operating cash flow is 3 to 4 days of revenue. With $4 billion of A/R, bad debt risk relative to cash is notable. Yes, ABC's cash balance appears substantial, however interesting to view in the above context.

(Petition to Compel Disclosure, ¶ 15[.])
Neil Herson is president of ASD Specialty Healthcare, Inc., a subsidiary of ABC. (Petition to Compel Disclosure, ¶ 10[.]) It is alleged that neither Neil Herson[,] "a highly placed executive affiliated with [ABC,]" nor ABC authorized or consented to these postings. (Petition to Compel Disclosure, ¶¶ 11, 17[.])

As a result of these alleged unauthorized postings, ABC filed a Writ of Summons on July 28, 2011 naming "John Doe" as a defendant. On August 3, 2011, ABC served a subpoena upon Dow Jones and Company, Inc. in order to discover the identity of the person or persons who posted the comments. (Petition to Compel Disclosure, ¶ 7[.]) Dow Jones and Company, Inc. provided two IP address-

---

or before January 23, 2012, rendering their filing facially untimely. However, Pa.R.A.P. 2185(a)(1), provides an exception for the transmission of a brief by mail, as follows: "Briefs shall be deemed filed on the date of mailing **if first class, express, or priority United States Postal Service mail is utilized**" (emphasis added). Appellants append to their Application a certificate to the effect that the brief was picked up by one Quick International Courier, headquartered in Herndon, Virginia, at 11:55 P.M. on January 23, 2012, and seek the benefit of Rule 2185(a)(1) (although they cite neither that rule nor any other in their application). The rule is clear: To benefit from the mailing exception, the documents must (1) be mailed, and (2) mailed via the United States Postal Service. In using a private courier at the last possible moment to transport their brief to Philadelphia, Appellants not only presumptively incurred a con-

siderable unnecessary expense, but they also failed to meet either of the rule's two mandatory criteria for briefs transmitted by mail. Consequently, this Court did not err in noting Appellant's brief as "late," and Appellants are not entitled to the relief requested. Given the lack of protest by Appellees, we elect to overlook Appellants' non-compliance with Rule 2185 pursuant to our discretion under Pa. R.A.P. 105(a), and will address this appeal. However, we caution counsel to adhere to the dictates of our rules of procedure in future practice before this Court. *See White v. Owens–Corning Fiberglas Corp.*, 447 Pa.Super. 5, 668 A.2d 136, 141 (1995) ("[T]he rules of appellate procedure are mandatory, not direct[ory,] and it is within our discretion to dismiss an appeal when the rules of appellate procedure are violated." (internal quotation marks omitted)). Appellants' application for relief hereby is denied.

es associated with the Barron's postings. (Petition to Compel Disclosure, ¶ 7[.]) ABC served a subpoena upon Verizon Online, LLC on August 30, 3011 seeking to identify the subscriber or subscribers associated with the IP addresses provided by Dow Jones and Company, Inc. (Petition to Compel Disclosure, ¶ 8[.]) By correspondence dated September 1, 2011, Verizon Online, LLC informed ABC [that] it would not disclose the identity of the subscriber or subscribers without an order from the court. (Petition to Compel Disclosure, ¶ 8[.)]

Subsequently, ABC filed a Petition to Compel Disclosure of John Doe's Identity by Third Party Verizon Online, LLC on October 13, 2011. Pursuant to the Pennsylvania Stored Communications Act, 18 Pa.C.S.A. §§ 5741[,] et seq. (Act), an entity may divulge a record or other information regarding a subscriber to an electronic communication service to a party to a legal proceeding, upon a court order entered under subsection (c.1) of 18 Pa.C.S.A. § 5742. 18 Pa.C.S. § 5742(c)(2)(iv).

\* \* \*

Upon consideration of ABC's Petition to Compel, the [c]ourt entered a preliminary Order dated March 13, 2012 requiring Verizon Online, LLC to disclose the identity of John Doe to the [c]ourt only. On or about March 22, [2012], Verizon Online, LLC provided to the [c]ourt the identities of the two subscribers associated with the IP addresses of the posts following the article on Barron's website. On April 19, 2012, the [c]ourt issued Rules upon both [Appellants] to show cause why his or her identity should not be disclosed to [Appellees]. Both [R]ules were filed under seal and included Notices to Defend as well as copies of ABC's Petition to Compel Disclosure. These Rules were sent by regular and certified mail. [Appellants] were provided 20 days within which to file any objections to disclosure. A hearing on any objections to disclosure was scheduled for June 11, 2012. On May 9, 2012, [Appellants] filed objections to disclosure and on June 8, 2012, [Appellants] sought a continuance of the June 11, 2012 hearing. The [c]ourt continued the hearing until July 11, 2012 and granted [Appellees] leave to file a reply to [Appellants'] objection to disclosure of identity.

Following a hearing on July 11, 2011, the [c]ourt granted [Appellees'] Petition to Compel Disclosure of [Appellants'] Identity; however, disclosure of [Appellants'] identity was to be delayed pending the expiration of the appeal period applicable to the Order and disposition of any timely filed appeal. [Appellants] timely filed a Notice of Appeal on June 10, 2012.

Trial Court Opinion ("T.C.O."), 12/7/2012, at 2–4.

Also relevant to our disposition of this appeal are the following events:

In conjunction with their request for a continuance on June 8, 2012, counsel for [Appellants] . . . sent a cover letter with a "Supplemental Affidavit of [John Doe] in Support of Special Appearance to the [c]ourt." The cover letter and Supplemental Affidavit sent to the [c]ourt contained the actual full name of one of the [Appellants]. Counsel for [Appellants] sent a copy of this cover letter to counsel for [Appellees]. It appears that [counsel] intended to redact John Doe's actual name. The letter contains a black marker over John Doe's name; however, the name is easily readable, despite having been crossed out.

By letter dated June 18, 2012, counsel for [Appellees] notified counsel for [Appellants] that he was now aware of the

identity of one of the [Appellants]. The letter further stated that now that counsel knew the identity of one of the [Appellants], he was entitled to the remaining discovery requested from Verizon Online, LLC and counsel for [Appellants] should withdraw any objections to [Appellees'] motion to compel discovery by June 20, 2012. Counsel for [Appellees] further stated that if counsel for [Appellants] did not withdraw their objections, counsel for [Appellees] would notify the [c]ourt of these matters.

On June 22, 2012, [Appellants] filed an Emergency Petition for Disqualification of [Appellees'] Counsel and to Prohibit and Enjoin [Appellees] from Commencing an Action against [Appellants] in Pennsylvania or Elsewhere....

Following a hearing on July 11, 2012, the [c]ourt denied [Appellants'] petition to disqualify counsel and ordered that [Appellees] not disclose or make further use of the identity of one of the [Appellants] as inadvertently disclosed by counsel for [Appellants] in his letter of June 8, 2012, pending expiration of the appeal period applicable to the Order entered and disposition of any timely filed appeal. [Appellants] timely filed a Notice of Appeal on June 10, 2012.

T.C.O. at 10–11.

We must begin by resolving a challenge to our jurisdiction over the instant appeal in its present procedural posture. On October 2, 2012, this Court issued an order directing Appellants to show cause as to why this appeal should not be quashed as interlocutory. Appellants responded with separate memoranda purporting to establish a basis for our jurisdiction with regard to each of the trial court's orders, and Appellees responded with opposition memoranda as to each.

■ Appellants first maintain that the trial court's orders effectively ended the matter before it, given the absence of a complaint, and therefore resolved all issues as to all parties. Therefore, both orders were "final" as defined by our rules and ripe for our review. *See* Pa.R.A.P. 341(b)(1) (defining a final order as "any order" that "disposes of all claims and of all parties").

Appellants' finality argument is substantially the same as to both orders, as is our analysis and resolution. Appellants contend that the challenged orders, in resolving both petitions, left no other issues in the court below. They cite Rule 341, but no case law, in support of the unstated premise that the pending writ of summons is immaterial to finality. However, the trial court's determination that Appellees have made out a *prima facie* case for one or more causes of action against each Appellant, *see* T.C.O. at 2, and Appellants' own belief that it was necessary to file a motion seeking to enjoin pursuit of any action in Pennsylvania against Appellants contradict this claim.

■ We have found no case law to establish this proposition. But the allowance of pre-complaint discovery following the filing of a writ of summons necessarily presupposes the future filing of a complaint. Equally self-evidently, the trial court should not grant such discovery unless it concludes that, upon the completion of discovery, the claimant will likely be able to make out one or more causes of action, and that the claimant intends in good faith to do so. *See Cooper v. Frankford Health Care Sys., Inc.,* 960 A.2d 134, 140 (Pa.Super.2008) (quoting *McNeil v. Jordan,* 934 A.2d 739, 742 (Pa.Super.2007)) ("[T]o obtain pre-complaint discovery a litigant should be required to demonstrate his good faith as well as probable cause that the information sought is both material and necessary to the filing of a complaint

in a pending action."). Thus, we cannot conclude that the challenged orders disposed of all claims as to all parties. Rather, they disposed only of Appellants' efforts to prevent disclosure of Appellants' identities, to disqualify Appellees' counsel, and to prevent the filing of a lawsuit against Appellants in Pennsylvania. Consequently, Appellants have failed to establish that the orders before this Court are justiciable as final orders under Rule 341. *Cf. G.B. v. M.M.B.*, 448 Pa.Super. 133, 670 A.2d 714, 717 (1996) ("[A]n order is not final and appealable merely because it decides one issue of importance to the parties. Rather, for an order to be final and ripe for appeal, it must resolve all pending issues and constitute **a complete disposition of all claims raised by all parties.**" (emphasis added)).

In the alternative, Appellants argue that we have jurisdiction under *Melvin v. Doe*, 575 Pa. 264, 836 A.2d 42 (2003), and *Pilchesky v. Gatelli*, 12 A.3d 430, 436–38 (Pa.Super.2011), which purportedly establish a right under the First Amendment to the United States Constitution [2] protecting Appellants against disclosure of their identities, *see* Memorandum Supporting Appellate Jurisdiction over Appeal from Court's Order Denying [Appellants'] Emergency Petition at 2; and further establish that "the law does not permit disclosure of the identity of a speaker who chooses to speak anonymously or pseudon-

ymously." Memorandum Supporting Appellate Jurisdiction over Court Order Granting [Appellees'] Petition to Compel Disclosure of [Appellants'] Identity at 2. In effect, Appellants argue that these orders are collateral orders under Pa.R.A.P. 313, and therefore appealable as of right.[3]

Rule 313 provides as follows:

**(a) General rule.** An appeal may be taken as of right from a collateral order of an administrative agency or lower court

**(b) Definition.** A collateral order is an order [1] separable from and collateral to the main cause of action where [2] the right involved is too important to be denied review and [3] the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost.

Pa.R.A.P. 313. Our Supreme Court has elaborated on the nature and purpose of the collateral order doctrine as follows:

As we explained in *Geniviva v. Frisk*, 555 Pa. 589, 725 A.2d 1209, 1214 (1999), the collateral order doctrine is a specialized, practical application of the general rule that only final orders are appealable as of right. Thus, Rule 313 must be interpreted narrowly, and the requirements for an appealable collateral order remain stringent in order to prevent undue corrosion of the final order rule. *See id.* To that end, each prong of the

---

**2.** Appellants base this aspect of their argument solely upon the First Amendment to the United States Constitution, and do not invoke Article 1 Section 7 of the Pennsylvania Constitution. As noted in *Pilchesky*, our Supreme Court "has repeatedly determined that Article 1, § 7 affords greater protection to speech and conduct in this Commonwealth than does its federal counterpart." 12 A.3d at 438 n. 10 (quoting *Melvin*, 836 A.2d at 47 n. 9).

**3.** In point of fact, their argument does not cite the doctrine as such, refer to the rule govern-

ing collateral orders, or present any argument beyond their rather general claim that the disclosure of Appellants' identities would irreparably harm Appellants in ways that cannot be rectified following the conclusion of a trial. However, the orders could be appealable only as collateral orders, given their posture. As well, Appellants' arguments touch upon the factors we must consider in evaluating whether the orders are collateral. Thus, we address Appellants' argument against that legal backdrop.

collateral order doctrine must be clearly present before an order may be considered collateral. Therefore, we must also give critical attention to the remaining criteria of whether the trial court's discovery order directly affects a right that is too important to be denied review and whether the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost.

As we stated in *Geniviva*, "[f]or purposes of defining an order as a collateral order under Rule 313, it is not sufficient that the issue be important to the particular parties. Rather it must involve rights deeply rooted in public policy going beyond the particular litigation at hand." *Id.* at 1213–14. Appellants assert that the First Amendment protects anonymous political speech, and that the courts, in order to protect that right, should require a public official defamation plaintiff to establish economic harm prior to obtaining discovery of an anonymous defamation defendant's identity. The importance of protecting against government infringement upon the rights afforded by the First Amendment to the United States Constitution is unquestionable. In order to determine whether the issue raised by Appellants meets the importance prong of the collateral order doctrine, we must determine whether the discovery order directly affects a right that is too important to be denied review.

*Melvin*, 836 A.2d at 46–47 (citations modified; footnote omitted). Thus, we must bear in mind the stringency with which we long have viewed invocations of the collateral order exception to the finality requirement, and must consider whether the asserted rights are "deeply rooted in public policy" and "too important to be denied review."

Appellants argue principally that both orders at issue in this case are collateral based upon this Court's holding in *Pilchesky*. As in *Pilchesky*, they maintain that the disclosure of their identities will cause irreparable harm that cannot be remedied following trial. Appellants contend that the First Amendment precludes Appellees' claims, and that the interest protected by the First Amendment—the allowance of free public comment on the Internet—will be compromised should disclosure be permitted in this case. On this issue, as well, Appellants' arguments do not differ with regard to the two challenged orders, and we evaluate them together.

■■■■ The trial court, in its opinion pursuant to Pa.R.A.P. 1925(a), did not address the question of finality. However, it did address Appellants' First Amendment argument. We begin by excerpting the trial court's discussion, which provides an apt discussion of the case law cited by Appellants:

> [Appellants] argue that the [trial court] erred in finding that disclosure of the identity of any [Appellants] is permitted under *Pilchesky*. Specifically, [Appellants] contend that the postings were protected by the First Amendment as anonymous or pseudonymous speech and the [c]ourt erred in failing to balance [Appellants'] First Amendment rights against the strength of [Appellees'] purported *prima facie* case pursuant to *Pilchesky*.
> In *Pilchesky*, the Superior Court addressed whether to compel disclosure of the identity of individuals posting messages on a website under unique user names or pseudonyms. The Superior Court determined that four requirements must be addressed in determining whether to order disclosure of the identity of a person who chooses to speak pseudonymously including, [e]nsuring

the individuals receive proper notification of the petition to disclose identity and [a] reasonable opportunity to be heard; establishment of a *prima facie* case by the plaintiff; presentation of an affidavit asserting that the information is being sought in good faith; and balancing the individuals' First Amendment rights against the strength of the plaintiff's *prima facie* case. *Pilchesky,* 12 A.3d at 442–45.

The Superior Court concluded that while the trial court provided proper notification of the petition to the defendants, the trial court did not properly focus on the plaintiff's duty to produce *prima facie* evidence of actual harm, did not require an affidavit of good faith and necessity and failed to conduct the required balancing test. Therefore, the Superior Court vacated the order of the trial court and remanded the matter for further proceedings.

*Pilchesky* is not applicable to the case at bar. The individuals in *Pilchesky* posted their comments on the internet anonymously or used pseudonyms or unique names. "Anonymous" is defined as "nameless" or "lacking a name or names." Black's Law Dictionary 84 (5th ed. 1979). "Pseudonym" is defined as "a fictitious name assumed by an author; a pen name." The American Heritage Dictionary 1461 (3d ed. 1992). "People are permitted to interact pseudonymously and anonymously with each other so long as those acts are not in violation of the law." *Pilchesky,* 12 A.3d at 439–40 (citing *Dendrite Int'l v. Doe No. 3* [342 N.J.Super. 134], 775 A.2d 756, 767 (N.J.Super.Ct.2001)). The Superior Court in *Pilchesky* opined that "[A]ny ruling that does not fully protect the anonymity of the anonymous Internet speaker may deter anonymous Internet speech." *Id.* at 439.

At bar, [Appellants] did not use a fictitious or pen name when posting the comments nor were the comments posted anonymously. [Appellants] utilized the name of a real person in an executive position with one of ABC's affiliates. It is clear from the pleadings that Neil Herson did not author these postings. [Appellants] used Neil Herson's name, without his permission, to post their own thoughts and comments regarding the Barron's article and falsely attributed the postings to Neil Herson. Unlawful speech, commercial or otherwise, is never protected for its own sake. *See Virginia State Bd. of Pharma. v. Virginia Citizens Consumer Counsel [Council],* 425 U.S. 748 [96 S.Ct. 1817, 48 L.Ed.2d 346] (1976). Because this speech does not constitute anonymous free speech, it does not warrant the protection of the First Amendment; therefore, *Pilchesky* is inapplicable.

T.C.O. at 8–9 (citations modified). The trial court having thoroughly and aptly reviewed *Pilchesky,* we adopt that portion of the above excerpt relating our analysis in that case.

In reviewing whether the challenged orders are collateral and immediately appealable, we grant *arguendo* that the issue in question is separable from and collateral to the main cause of action, and that it presents an issue that will be irreparably lost should we decline to review it presently. This leaves only two questions: first, whether Appellants have any right to misattribute patently non-satirical comments to an individual with a direct connection to the subject matter; and, if so, whether that right is "too important to be denied review." Relative to these questions, we must consider Appellants' assertion of a First Amendment right to post their commentaries under Mr. Herson's name. We find no such right.

Appellants' argument in response to this Court's rule to show cause is passingly brief, and reliant more or less exclusively on *Pilchesky*. However, in their merits brief, Appellants call our attention to several extra-jurisdictional decisions, which we review in turn. In *Highfields Capital Management, L.P. v. Doe*, 385 F.Supp.2d 969 (N.D.Cal.2005), the court granted John Doe's motion to quash a subpoena seeking Doe's identity from internet service provider Yahoo!. At issue in that case were hedge fund manager Highfields' claims for violations of trademark and unfair competition laws arising from Doe's use of the screen name "highfieldscapital" when posting several messages to an internet message board. At the time Highfields filed suit, it was the largest shareholder in Silicon Graphics, Inc ("SGI").

The three messages in question included the following:

"It appears that this will be a very fine day."

"We trust our retail investor friends have taken advantage of this quarter's SGI pre-earnings rally, which occurred this morning. It's just Highfields' way of sharing important information with our smaller, yet still highly valued, partners in the exciting story of Silicon Graphics. While it's always impossible to be specific, it might be expected that the stock has now returned to its typical trading range."

"We're going to buy a new corporate jet ... a Gulfstream IV. It will have custom zebrano wood trim and Corinthian leather seats with plasma TVs. Best of luck to our retail friends today and tomorrow!"

*Id.* at 973 (footnote omitted). The court noted that in the "several years" preceding these postings, SGI's share price "fluctuated wildly" between $0.32 and $12.56. *Id.* The first post appeared on July 21, 2004, the morning after SGI shares had closed at $1.82, down from the calendar-year high of $3.80. The second post was published after the market closed the same day, when SGI closed at $1.77; the following day SGI closed at $1.75. The third post appeared on July 27, with the stock closing that day at $1.65. On July 28, SGI evidently reported disappointing earnings, and the share price plummeted to $1.43. *Id.* at 973–74.

The court emphasized that its task was to "strike an appropriate balance between competing interests and public policies" in their specific context, following which it was required to "make judgments about how much harm, if any, each of the proposed competing resolutions of [the] dispute would do to the implicated interests or public policies." *Id.* at 974. Invoking what it specifically referred to as one's "right to express most effectively and anonymously ... his views about matters in which many other members of the public are interested" without fear of reprisals, the trial court characterized the comments as "sardonic commentary on a public corporation," noting their "irony," "parody," and implicit expression of dissatisfaction with SGI's performance and skepticism regarding Highfields' investing practices. *Id.* at 974–75. Noting Highfields' competing interests in protecting itself from unfair competition and commercial disparagement, the court nonetheless found that the First Amendment protections for "anonymous" comments trumped Highfields' interests, in part for the above-stated reasons and in part because the claims asserted required a showing of financial injury that Highfields had failed to make. *Id.* at 979–80.

The nature and context of the comments in *Highfields* distinguish it from the instant case. The comments at issue herein were not manifestly satiric, ironic, or sar-

donic. Moreover, they were not posted in the name of an entire company, which manifestly would be unlikely to make such comments, but rather in the name of one person who might be expected to be well-informed regarding the information related in the commentary, and who might be expected to have a personal interest in making certain impressions with the investing public. In *Highfields,* most importantly, the court's emphasis on anonymity, and its citation of cases addressing only anonymous and pseudonymous commentary, suggests that the court considered the use of a company name as a username to be tantamount to posting anonymously or pseudonymously. In short, the court believed that any reasonable reader would conclude that the speaker had no association with that company. Thus, *Highfields,* like *Pilchesky,* does not speak directly to the unauthorized appropriation of Mr. Herson's name in this case.

Similar distinctions apply variously to each of the other cases relied upon by Appellants. In *Farah v. Esquire Magazine, Inc.,* 863 F.Supp.2d 29 (D.D.C.2012), the district court found a superseding First Amendment interest in deliberately misattributed comments that it deemed to be satirical and concerning a "public issue[, the claim that President Barack Obama was not born in the United States and hence was constitutionally unqualified to hold the office of President, which] occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Id.* at 39 (quoting *Raymen v. United Senior Ass'n, Inc.,* 409 F.Supp.2d 15, 22–23 (D.D.C.2006)).

In *Raymen,* again, the misappropriation in question—in that case, arising from the use in an ad campaign of a photograph of claimants—occurred in connection with the debate over gay marriage, undisputedly an important public issue. As well, the sole implication of the use of the photo—that the individuals pictured were gay and supported gay marriage—was truthful, and therefore incapable of the defamatory meaning required to support the plaintiffs' claims. *Id.* at 22–23.

█ We reject Appellants' attempt to glean from these cases that fraudulently ascribing commercially salient information to a particular person in a position to know such information, one whose employment status or legal position might be compromised by such commentary under state or federal securities laws and regulations, enjoys the same First Amendment protections as obvious satire or indirect associations of individuals in the expression of opinions in the context of debate over important public issues or any First Amendment protection at all. Our decision in *Pilchesky* itself militates in favor of our conclusion, in its observation that "[p]eople are permitted to interact pseudonymously and anonymously with each other **so long as those acts are not in violation of the law.**" *Pilchesky,* 12 A.3d at 439–40 (emphasis added); *see generally Virginia State Bd. of Pharma.,* 425 U.S. at 771, 96 S.Ct. 1817 ("Untruthful speech ... has never been protected for its own sake."); *Ins. Adjustment Bureau v. Ins. Comm'r for the Commonwealth of Penna.,* 518 Pa. 210, 542 A.2d 1317, 1320 (1988) ("[F]alse, misleading or untruthful speech does not enjoy First Amendment protection....").

For the foregoing reasons, we are constrained to find that Appellants have no protectable interest in their identities sufficient to outweigh Appellees' right to identify Appellants for purposes of seeking legal redress for Appellants' illegal appropriation of Mr. Herson's name in a public

forum.[4] Consequently, Appellants have failed to meet the "stringent" collateral order test by demonstrating that the right at issue, if any, is a right "deeply rooted in public policy," as required by our Supreme Court in *Melvin*. The comments in question do not constitute obvious satire, and were not such that a reasonable reader could be expected to recognize that Mr. Herson's name was used ironically or as part of protected commentary on an issue of public importance.[5] Nor were the comments anonymous or pseudonymous, which are the only categories of commentary clearly protected by the case law discussed herein. Thus, we hold that this Court lacks jurisdiction under the collateral order doctrine to review Appellants' challenge to the trial court's order directing disclosure of Appellants' identities.

Our determination that we lack jurisdiction to review that order makes clear that we also lack jurisdiction at this time to review Appellants' challenge to the trial court's order declining to disqualify Appellees' counsel and to enjoin Appellees from commencing an action against Appellants in this case. First, the asserted basis for disqualification was Appellees' lawyer's allegedly improper or unwarranted discovery of one John Doe's identity through an inadvertent disclosure by Appellants' counsel. In holding that Appellants have no apparent First Amendment right to attribute their own commentary to Mr. Herson such that appeal is warranted, the basis for their challenge to the trial court's refusal to disqualify counsel is devoid of a premise critical to establishing that the right to disqualify counsel is so important as to satisfy the collateral order's stringent standard.[6] And while want of personal jurisdiction over Appellants ultimately may preclude suit, the First Amendment does not require that we consider the issue at this time, especially given what appears to be incomplete fact-finding in the trial court concerning the predicates, or lack thereof, for the trial court's exercise of such jurisdiction. The jurisdictional question may be determined in due course only after the trial court's disclosure order is effectuated. Consequently, that aspect of the trial court's order simply is not ripe for review, and does not satisfy the collateral order standard. Thus, the trial court's order refusing to disqualify Appellees' counsel and enjoin further action against Appellants also is not a collateral order entitling

---

**4.** We emphasize that our ruling addresses only the appealability of the orders at bar. We express no opinion as to the potential interplay of Appellants' First Amendment rights with Appellees' right to be protected from the wrongdoing alleged in this case that may be revealed by further proceedings.

**5.** We do not reject out of hand the public importance of free commentary with regard to financial markets. One need only consult the collective net worth of the companies listed on any major stock exchange, and consider the pervasive and dramatic adverse effects (vividly underscored by recent events) that market behavior may have on the fiscal health of a nation and everyone in it, to recognize an important public interest in the free flow of financial information, which is critical to the orderly function of the market generally. *Cf. Virginia State Bd. Of Pharma.*, 425 U.S. at 765, 96 S.Ct. 1817 (describing the free flow of commercial information as "indispensable to the proper allocation of resources in a free enterprise system"). But nothing cited by Appellants or discovered in our research suggests that this interest is so great as to warrant allowance of the potentially damaging ascription of seemingly sincere informational comments on such topics to an individual who did not, in fact, make those comments.

**6.** We find this argument perplexing. It is self-evident that to so rule would open the door to the unsettling prospect of attorneys making deliberate tactical disclosures to disqualify an adversary's attorney.

Appellants to interlocutory review as of right.

We must conclude that Appellants failed to establish that either order at issue is a collateral order under Rule 313. Consequently, we lack jurisdiction at this time to review Appellants' appeal on the merits.

Appeal quashed. Application for Relief denied. Case remanded. Jurisdiction relinquished.